IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

STEPHEN R. BEEGLE,

            Plaintiff,

      v.                                    Civil Action No. 5:09-CV-59

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.      Background

        Plaintiff, Stephen Beegle (Claimant), filed a Complaint on May 29, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

24, 2009.[2]  Claimant filed his Motion for Summary Judgment on September 23, 2009.[3]

Commissioner filed his Motion for Summary Judgment on October 21, 2009.[4]

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 11.

[4] Docket No. 12.

2.      <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C.      <u>Recommendation</u>

I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err in determining that Claimant's substance use disorder is a contributing factor material in the disability determination.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A.      <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DBI) and Supplemental Security Income (SSI) on February 22, 2006, alleging disability due to drug/alcohol addiction, depression, paranoia, chronic bronchitis, left knee injury, learning disability, and GERD beginning August 15, 2005. (Tr. 143). The claim was denied initially on August 18, 2006, and upon reconsideration on December 4, 2006. (Tr. 90, 101). Claimant filed a written request for a hearing on January 2, 2007. (Tr. 106). Claimant's request was granted and a hearing was held on February 15, 2008. (Tr. 23-80).

The ALJ issued an unfavorable decision on May 13, 2008. (Tr. 7-22). The ALJ determined Claimant would not be disabled if he stopped the substance use because he had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d) and 416.920(d)), and there are jobs that exist in significant numbers in the national economy that the

Claimant can perform (20 CFR 404.1560(c) and 404.1566). (Tr. 15). On July 7, 2008, Claimant filed a request for review of that determination. (Tr. 4-6). The request for review was denied by the Appeals Council on April 2, 2009. (Tr. 1-3). Therefore, on April 2, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on August 12, 1962, and was forty-three (43) years old as of the onset date of his alleged disability and forty-five (45) as of the date of the ALJ's decision. (Tr. 32). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations at the time of her onset date and at the time of the ALJ's decision. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant received his GED in 1981and attended college for one and one half (1 ½) years. (Tr. 39). Claimant has previous work experience as a cook and manager at Pizza Hut, a cook at Kentucky Fried Chicken, a laborer for a tire company, and window manufacturer for SNE Enterprises. (Tr. 40-45).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Medical Records, Northwood Health Systems 8/11/05- 1/29/08 (Tr. 212-343 & 393-529 & 598-630 & 639-74)**
•        8/11/05 psychiatric evaluation
        •        chief complaint: depression

- substance abuse history: 2 DUIs; drinking led to his divorce; used alcohol and marijuana since a teenager; last used alcohol 4 days ago; smoked cigarettes for 35 years
- mental status: grooming and attire is appropriate, clean and casual; little eye contact; affect was appropriate; alert times four; thought process is linear; didn't speak of any suicidal, homicidal, or delusionary themes
- assessment:
  - axis I: major depressive disorder, recurrent, moderate without psychosis vs. dysthymic disorder; alcohol dependence; cannabis abuse
  - axis II: deferred versus none
  - axis III: chronic bronchitis, sinusitis
  - axis IV: difficulties with psychosocial environment
  - axis V: GAF 40
- plan: recommended abstain from alcohol and get reinvolved with AA
- 8/19/05 group counseling
  - problem: aggressive behavior
  - goal: express anger more appropriately
  - assessment: normal; unremarkable
  - plan: weekly group session
  - problem: relationship problems
  - goal: communicate with people more
  - assessment: soft speech; anxious mood; irritable affect
  - plan: weekly individual therapy sessions
- 8/26/05 individual psychotherapy
  - problem: aggressive behavior
  - goal: express anger more appropriately
  - assessment: disheveled appearance; anxious mood; flat affect
- 8/26/05 group counseling
  - problem: aggressive behavior
  - goal: express anger more appropriately
  - assessment: unkempt appearance; depressed mood; flat affect
  - outcome: symptoms and functional difficulties have improved; needs continued service in order to achieve full recovery and relapse prevention
- 9/2/05 individual therapy
  - problem: depression
  - assessment: anxious mood; irritable affect; alert, active participant in session
  - plan: encourage him to attend AA on regular basis
- 9/8/05 pharmacological management template
  - intervention and purpose: known or suspected behavioral health diagnosis; determined that there is a need for psychatropic medications
  - assessment: good initial response
- 9/16/05 group counseling
  - problem: aggressive behavior
  - assessment: normal; no recent anger outbursts; attending AA meetings on a

regular basis

- <u>1/12/06 medical necessity assessment</u>
  - case status: update open case
  - reason for referral: admission to crisis stabilization services
    - acute psychiatric signs and symptoms of depression, anxiety, hostility, social withdrawal, impulsiveness, poor judgment, poor concentration, feelings of worthlessness, helplessness and hopelessness, agitation, low energy, poor appetite, poor sleeping patterns and a lack of motivation
  - current mental status:
    - orientation: oriented times 4
    - speech and appearance: within normal limits
    - thought content: thought blocking
    - sociability: isolation
    - memory: mildly impaired
    - drug usage: alcohol in last 30 days - drinking between a pint and a fifth daily for months
  - diagnostic impressions:
    - primary axis I: major depression, recurrent, severe, without psychosis
    - secondary axis I: polysubstance dependence
  - summary/recommendation: begin crisis stabilization due to exacerbation of acute psychiatric signs and symptoms of depression, anxiety, hostility, social withdrawal, impulsiveness, poor judgment, poor concentration, feelings of worthlessness, helplessness and hopelessness, agitation, low energy, a poor appetite, poor sleeping patterns, and a lack of motivation
- <u>1/12/06 admission assessment</u>
  - presenting problems: increase anxiety; thoughts of hopelessness and worthlessness; grief issues; past abuse-physical and verbal; drug abuse; anger problems direct inward relationship
  - substance abuse: used alcohol yesterday - drank 1/5 of whiskey; used drugs yesterday - 6 ephedrine and 6 sleeping pills
  - admission criteria: psychiatric symptoms and drug/alcohol withdrawal
- <u>1/12/06 psychiatrist orders and intervention: psychiatric evaluation</u>
  - admission diagnosis:
    - axis I: 296.33; 304.80
    - axis II: V71.09
    - axis IV: 01
    - axis V: 25
  - admission criteria: experiencing a crisis due to mental condition and/or impairment in functioning due to acute psychiatric signs and symptoms. Impaired abilities in daily living skills domain to severe disturbances in conduct and emotions. Emotional and/or behavior instability may be exacerbated by family dysfunction, transient situation disturbance, physical or emotional abuse, failed placement , or other current living situation; evidence client is using drugs, which have produced a physical dependency

- discharge plan: pharmacological management; case management; group and individual therapy; individual supportive counseling; first step
- 1/13/06 psychiatric review
  - continuing stay criteria: severity lessened a little; slept better; alcohol cravings
  - mental status exam: appropriate general appearance; oriented; appropriate mood
  - discharge plan: unchangd from admission plan
  - outcome: continue in crisis stabilization; continue present medication
  - substance abuse assessment: "drank a lot" between a pint and fifth for months. In and out of recovery; illegible.
- 1/14/06 - 2/3/06 intervention
  - During the course of treatment at Northwood, Claimant's condition fluctuated. Claimant's sleeping patterns changed - sometimes having sleeping problems and sometimes sleeping through the night; Claimant's eating patterns varied. Claimant's anxiety, depression, paranoia, and uneasiness around people fluctuated. New symptoms such as headaches, face pain and pressure, and nausea appeared. Claimant's mental status examination always revealed an appropriate general appearance. Claimant's discharge plan remained unchanged throughout the duration.
- 2/3/06 discontinuation of treatment
  - discontinue from stabilization services and observation; instructed to self-administer medication. Resume pharmacological management, individual therapy, and chart administration.
  - current status: Claimant was able to reduce anxiety and depression levels, hostility, and agitation during crisis stabilization. Claimant reported decreased delusional ideations, paranoia and suspiciousness. Crisis stabilization services are being discontinued due to Claimant's completion of treatment plan objectives and establishment of an effective medication protocol.
  - current mental status:
    - orientation: oriented times 4
    - speech, appearance, thought content: within normal limits
    - sociability: withdrawn
    - memory: mildly impaired
  - summary/recommendation: reduced hostility, agitation, delusional ideations, paranoia, and suspiciousness; improved energy and motivation levels and sleeping and eating patterns. Claimant will follow-up with pharmacological management, individual therapy, group professional therapy and assistance with TCM upon discharge from crisis unit.
- 2/10/06 individual counseling
  - problem: depression
  - assessment: soft speech; depressed mood; blunted affect; Claimant did not satisfactorily complete last session's homework assignment
  - outcome: continued acute symptoms causing functional difficulty; instructed to go back to AA meetings
- 2/17/06 individual counseling

- problem: depression
- assessment: unkempt appearance; poor hygiene; soft speech; depressed mood; irritable affect; did not make it to his AA meeting last week and is experiencing alcohol cravings
- outcome: needs to get back to AA

- 2/22/06 medical necessity assessment
  - current status: acute psychiatric signs and symptoms of depression; anxiety; hostility; self-neglect; withdrawal; impulsiveness; poor judgment; poor concentration; feelings of worthlessness, helplessness, and hopelessness; agitation; low energy; a poor appetite; poor sleeping patterns; and lack of motivation. Medication non-compliance; increase in depression and anxiety; homicidal ideations
  - current mental status:
    - orientation: oriented times 4
    - speech: rapid
    - appearance: disheveled
    - thought content: thought blocking
    - sociability: withdrawn
    - memory: mildly impaired
  - no current cravings to abuse substances; has not used alcohol or drugs since discharged from CSU
  - summary/recommendation: being crisis stabilization. Claimant presents with crisis level symptoms interfering with daily functioning, presents as a danger to others requiring intensive monitoring to prevent hospitalization, and presents with medical noncompliance.

- 2/22/06 crisis stabilization admission assessment form
  - substance abuse: has consumed beer and drugs in last week

- 2/23/06 - 3/3/06 interventions
  - Claimant's symptoms, including sleeping and eating patterns and anger levels, fluctuated throughout the stay. New symptoms reported were acid reflux, twitching, nausea, and "flashes." Mental status examination revealed appropriate general appearance. Discharge plan and medication remained unchanged throughout duration of stay.
  - indication on 2/23/06 that Claimant is using drugs, which have produced a physical dependency as evidenced by clinical significant withdrawn symptoms, which require medical supervision.

- 3/3/06 discontinue crisis stabilization services
  - treatment objectives met; resume pharmacological management and individual therapy
  - current mental status:
    - oriented times 4
    - speech, appearance, thought content: within normal limits
    - sociability: withdrawn
    - memory: mildly impaired

- summary/recommendation: discontinue stabilization services because Claimant completed treatment plan objectives and established an effective medication protocol. Claimant decreased depression, anxiety, agitation, and hostility levels and reported an absence of homicidal ideations. Claimant improved level of socialization and reduced his impulsiveness and poor judgment. Reported improved concentration and reported feeling more hopeful and less helpless and hopeless. Improved appetite and sleeping patterns; improvement in motivation and overall energy level. Follow-up with pharmacological management, individual therapy, and group therapy.
- 3/17/06 pharmacological management template
  - assessment: patient is stable
  - individual plan: continue current medication; follow up
- 3/24/06 individual counseling
  - problem: depression
  - assessment: unkempt appearance; poor hygiene; depressed mood; flat affect; minimal progress towards goal
  - outcome: reports abstaining from alcohol use but no AA-reinvolvement; not reengaged in AA meetings in over 6 months - encourage him to reconnect
- 4/14/06 pharmacological management template
  - assessment: stable and near baseline
  - plan: continue current medications
- 5/1/06 medical necessity assessment
  - admission to crisis stabilization services
  - current status: acute psychiatric signs and symptoms of depression; anxiety; hostility; violence; self-neglect; social withdrawal; impulsivity; poor judgment; delusions; paranoia; poor concentration; suspiciousness; feelings of worthlessness, helplessness, and hopelessness; crying; agitation; low energy; poor appetite; poor sleeping patterns; lack of motivation
  - current mental status: oriented x4; rapid speech; disheveled appearance; thought blocking; sociability: isolation; memory: mildly impaired
  - reports drinking up to a pint daily for the past week; also reports using marijuana once during past week; expresses anger with himself for relapsing
  - summary/recommendation: begin crisis stabilization services; reports relapsing on alcohol and getting into physical confrontation with his girlfriend.
- 5/2/06 psychiatric evaluation
  - admission criteria: feelings of helplessness and hopelessness; loss of interest in activities; poor concentration; change in sleep pattern; depression; drinking and using drugs; danger to others
  - discharge plan: pharmacological management, direct care by physician, case management
- 5/3/06 - 5/9/06 interventions
  - Claimant's condition fluctuated throughout stay. Sleeping, appetite, and energy level increased and decreased. New symptoms included shaking, . Claimant's general appearance during mental status examination was appropriate. Discharge

- plan remained unchanged throughout treatment.
- 5/9/06 order to discontinue crisis stabilization services
  - discontinue services and observation status because treatment objective has been met. Resume pharmacological management, direct care by physician, individual therapy, and case management services.
  - current mental status: oriented x4; speech and appearance within normal limits; thought blocking content; withdrawn; mildly impaired memory
  - summary/recommendation: able to reduce psychiatric symptoms to levels that do not interfere with daily functioning; this includes depression, anxiety, hostility, violence, self-neglect, social withdrawal, impulsivity, poor judgment, delusions, paranoia, poor concentration, suspiciousness, feelings of worthlessness, crying, agitation, low energy, poor appetite, poor sleeping patterns, and lack of motivation. Follow-up with pharmacological management and individual therapy.
- 6/30/06 pharmacological management template
  - assessment: stable
  - plan: discontinue vistaril and restart trazodone
- 7/28/06 pharmacological management template
  - assessment: stable
  - individual plan: continue current medications
- 7/30/06 medical necessity assessment
  - current status: acute psychiatric signs and symptoms of depression; anxiety; hostility; violence; self-neglect; social withdrawal; impulsivity; poor judgment; delusions; paranoia; poor concentration; suspiciousness; feelings of worthlessness, helplessness, and hopelessness; crying; agitation; low energy; poor appetite; poor sleeping patterns; lack of motivation. Relapsed on alcohol; fighting with girlfriend; severe anger issues; drinking "a couple of shots of Vodka about 4 or 5 hours ago;" denies recent drug use
  - current mental status: oriented x4; rapid speech; disheveled appearance; normal thought content; withdrawn; mildly impaired memory
  - summary/recommendation: begin crisis stabilization services
- 7/31/06 psychiatric evaluation
  - admission criteria: paranoia, feelings of helplessness and hopelessness, loss of interest in activities, poor concentration, change in sleep pattern, relationship problems
  - discharge plan: pharmacological management, direct care by physician, case management
- 7/31/06 interventions
  - Claimant's condition fluctuated throughout visit. Appetite and sleeping patterns increased and decreased. Feelings of depression, anger, anxiety increased and decreased. New symptoms included swelling of feet and hands, headache, and indigestion. Mental status examination revealed appropriate general appearance throughout duration of stay.
- 8/15/06 order to discontinue crisis stabilization services

- discontinue stabilization services per client request
- resume pharmacological management, individual therapy, and case management services
- current mental status: oriented x4; speech and thought content within normal limits; disheveled appearance; isolation sociability; mildly impaired memory
- summary/recommendations: discontinue crisis stabilization services per client request and against professional advice. Denies having any suicidal or homicidal ideations, plans, or intentions, as well as hallucinations. Recommended client participates in pharmacological management, individual therapy, and case management services.
- 8/30/06 medical necessity assessment
  - current status: acute psychiatric signs and symptoms: depression; anxiety; hostility; social withdrawal; impulsivity; poor judgment; delusions; paranoia; poor concentration; suspiciousness; feelings of worthlessness, helplessness, and hopelessness; panic; agitation; low energy; poor sleeping patterns; and lack of motivation
  - current mental status: oriented x4; rapid speech; appearance and thought content within normal limits; isolation sociability; mildly impaired memory
  - reports drinking once a few days ago, but he tries to avoid drinking because it leads to problems
  - summary/recommendation: begin crisis stabilization services
- 8/30/06 admission assessment form
  - reason for admission: anger, stress, depression, paranoid
  - substance abuse: alcohol - last drank yesterday - beer
  - discharge plan: pharmacological management, supportive group counseling, individual supportive counseling, individual therapy, case management
- 8/31/06 psychiatric evaluation
  - admission criteria: suspiciousness, paranoia, feelings of helplessness and hopelessness
- 9/1/06 - 9/6/06 interventions
  - Claimant presented with anxiety and depression. Claimant's status fluctuated throughout duration; at times felt nervous, shaky, depressed. New symptoms included . Claimant's general appearance was appropriate during all mental status examinations. Discharge plan remained unchanged.
- 9/6/06 order to discontinue crisis stabilization services
  - discontinue because treatment objective met
  - medication through self-administration
  - resume: pharmacological management, individual therapy, and case management services
- 9/22/06 pharmacological management template
  - assessment: stable
  - plan: continue current medications
- 10/12/06 individual therapy progress note
  - problem: relationship problems

- assessment: slow speech; depressed mood; blunted affect
- wore hunting garb; noted he lives in country and enjoys being in the woods and hunting different animals.
- outcome: conflict resolution and coping strategies
- <u>10/19/06 individual therapy progress note</u>
  - problem: depressed mood
  - assessment:
    - unkempt appearance; poor hygiene
    - slow speech
    - depressed mood and blunted affect
  - client apologized for attending last session after drinking a beer
  - outcome: completed homework assignment; signs and symptoms of depression and other negative effects continue to cause impairments
- <u>11/2/06 - 9/5/07 individual therapy progress note</u>
  - problems included: depressed mood; relationship problems
  - assessment:
    - appearance ranged from unkempt, disheveled, unremarkable
    - grooming ranged from noticable body odor to unremarkable
    - speech ranged from normal to slow
    - mood ranged from depressed to anxious
    - affect ranged from normal, flat, blunted
    - claimant reported: worrying; depression; problems sleeping; anxiety due to relationship, SSI claim, losing his van key, son in Iraq, fiancé battling cancer, and taking medical tests; varying appetite levels
  - outcome: continue treatment
  - notes: Claimant reappeared in therapy after period of absence on 4/19/07 (absent since 2/8/07)
- <u>12/22/07 medical necessity assessment</u>
  - current status: admission to crisis stabilization services citing exacerbation of psychiatric signs and symptoms of acute depression; anxiety; poor judgment; feelings of worthlessness, hopelessness, and helplessness; crying; severe suicidal ideation (with plan and intent); social withdrawal; impulsivity; paranoia; poor concentration; suspiciousness; agitation; decrease in appetite; decrease in sleep pattern; loss of interest in activities; moderate self-neglect; self-injury; auditory and visual hallucinations; thought blocking; blunted affect; panic; mania; and decrease in energy. Has been drinking; has not been eating or sleeping.
  - current mental status: oriented x4; speech within normal limits; disheveled appearance; thought blocking; withdrawn; mildly impaired memory
  - drug/substance abuse:
    - 9/19/07: reports falling off the wagon and drinking to excess requiring an ambulance call from a friend due to passing out
    - 10/24/07: no usage reported
    - 10/28/07: not has used for 1 ½ months
    - 12/4/07: reports no recent use

- • 12/22/07: reports drinking since he got back to "the local area"
  - • summary/recommendations: begin crisis stabilization services
- • 1/16/08 medical necessity assessment
  - • current status: exacerbation of psychiatric signs and symptoms of acute anxiety; depression; social withdrawal; poor judgment; feelings of hopelessness and helplessness; lack of motivation; panic; severe impulsivity; delusions; paranoia; poor concentration; suspiciousness; blunted affect; agitation; low energy; poor sleeping patterns; moderate self-neglect; thought blocking.
  - • current mental status: oriented x4; rapid speech; disheveled appearance; thought blocking; isolation; mildly impaired memory;
  - • drug/alcohol:
    - • 1/7/08: No substance use during crisis stabilization
  - • summary/recommendation: begin crisis stabilization services
- • 1/22/08 medical necessity assessment
  - • current status: continues to report problems with acute depression; anxiety; social withdrawal; poor judgment; feelings of hopelessness and helplessness; panic and a lack of motivation; severe impulsivity; delusions; paranoia; poor concentration; suspiciousness; blunted affect; agitation; low energy; poor sleeping patterns; moderate self-neglect and thought blocking. Frustrated due to his inability to concentrate and his continued panic attacks. Continues to appear depressed as evidenced by blunted affect, a somber mood and poor adl's.
  - • current mental status: oriented x4; speech within normal limits; disheveled appearance; thought blocking; isolation; mildly impaired memory
  - • recommendation/summary: continue with crisis stabilization

**Wheeling Health Right, Inc. Patient Health History 8/17/05 (Tr. 346-48)**
- • reason for seeking care: prescriptions
- • alcohol/drugs: none in three months

**Diagnostic Radiology, Thomas F. Lee, MD, 2/7/06 (Tr. 210)**
- • XR finger left
- • impression: comminuted fracture of the left 1st distal phalanx

**Medical Records Wetzel County Hospital, 5/22/06-8/5/06 (Tr. 530-53)**
- • 5/25/06 emergency department records
  - • rectal bleeding
  - • x-ray impression: no acute pulmonary process; normal heart size; intact visualized osseous structures; no ileus or obstructive intestinal gas pattern
- • 7/11/06 diagnostic radiology report
  - • reason: chronic bronchitis; left knee injury
  - • impressions: grossly stable heart and lungs; no new acute process; unremarkable findings of left knee on 2 views
- • 7/11/06 emergency department
  - • chief complaint: right eye red; draining; itching

- exitcare: eye patched and given medication

**Medical Records, Thomas J. Schmitt, MD 7/6/06 (Tr. 349-60)**
- seen on 6/29/06 for evaluation of gastrointestinal status, drug & alcohol abuse, and pulmonary status
- drug & alcohol abuse: long standing history of drug and alcohol abuse. Has GERD and is treated by Prevacid. Mental signs of depression and extreme anxiety. Normal orientation; no unusual behavior
- mental status: alert and oriented; no evidence of impaired judgment, memory, or bizarre behavior; no signs of constriction or restriction of interests; patient appears to be able to manage his own funds; no evidence of agnosia, apraxia, or aphasia
- summary, evaluation and impression: extreme anxiety; apparent impairment of social function or restriction of activities. Claims he has recently started to consume alcohol again
- impression: drug & alcohol abuse by history; anxiety and nervousness; GERD by history with no evidence of gastrointestinal malfunction

**Physician's Summary, West Virginia Department of Human Services, 12/29/06 (Tr. 590)**
- diagnosis: major depression, recurrent, with psychosis; polysubstance abuse
- prognosis: poor to fair; long-term treatment necessary

**Clinic Report, Sistersville General Hospital, Gary Nichols, M.D., 8/31/07 - 1/9/08 (Tr. 676-95)**
- <u>8/31/07 clinic report</u>
  - past medical history: GERD; chronic sinusitis; depression/anxiety
  - assessment/plan: atypical chest pain - could be secondary to esophagitis; chronic sinusitis; left knee pain; GERD; urinary frequency; erectile dysfunction; depression/anxiety; family history of colon cancer; family history of heart disease
- <u>9/4/07 diagnostic radiology</u>
  - reason for procedure: chest pain
  - indication: chest pain for 3 weeks
  - impression: no acute process
  - reason for procedure: left knee
  - indication: chronic left knee pain
  - impression: stable left knee with no new soft tissue or bony abnormality
- <u>9/6/07 diagnostic radiology</u>
  - reason for procedure: pain
  - impression: no evidence of mucosal thickening. No fluid levels are seen; no sinue expansion is noted
- <u>9/6/07 chest examination</u>
  - diagnosis: chest pain
  - findings: good physical work capacity for age; normal ST segments at rest and during exercise; no angina; no arrhythmias; blood pressure response was physiologic; test was stopped due to leg fatigue and shortness of breath; oxygen

- saturation was 98% at maximum exercise
  - conclusions: normal EKG response
- 9/28/07 clinic report
  - assessment and plan: chest pain, likely secondary to GERD; GERD; chronic rhinitis; COPD; left knee pain; elevated blood pressure; family history of colon cancer
- 1/9/08 clinic report
  - HPI: has been drinking alcohol
  - assessment/plan: hypertension - new diagnosis; GERD; chronic rhinitis; sleep apnea
- 1/20/08 diagnostic radiology
  - reason for procedure: chest pain
  - impression: negative study

**letter, Ronald Rielly, Ed.D, Mid-Valley Healthcare, 2/11/08 (Tr. 631)**
- current diagnosis: major depression, recurrent with psychotic features; substance dependence is secondary - in early partial remission

**Consultative Evaluation Report - adult mental status examination, Barbara Rush, Ph.D., 7/19/06 (Tr. 361-67)**
- chief complaints: chronically depressed; sleeps a lot, but also times where he can't sleep; no energy; cannot focus or concentrate; anxiety attacks; in the past has tried to drink himself to death; feels paranoid; uncomfortable around people
- substance abuse history: began abusing substances at 13 with alcohol; later began using narcotics including morphine, amphetamines, cocaine, and acid around age of 16. Stopped using amphetamines, cocaine, and hallucinogens 15-20 years ago. Continued with narcotics up to two years ago. Drinking about half a gallon of whiskey on a daily basis up until last hospitalization about 1 month ago. Continued to smoke marijuana every day up until about 1 ½ months ago. Smokes 3 packs of cigarettes/day and drinks 3-4 pots of coffee/day. Went through withdrawal when last hospitalized; longest period of sobriety (2 years) was 8-10 years ago. Denied any current drug or alcohol use. Was asked on several occasions during the interview because his speech was slurred, his eyes were red, and his cognition seemed sluggish. Claimed he is attending AA 3 times/week
- mental status exam: unkempt, but appropriate appearance; poor grooming; smelled of tobacco. Cooperative behavior; good eye contact; slurred, slowed speech; oriented x3; reported chronic depression; flat and intense affect; gait was steady but slowed; sluggish thought process - great deal of difficulty with details; appropriate thought content; fair insight and judgment. Occasional thoughts of suicide.
- diagnoses:
  - axis I: alcohol dependence, cannabis dependence, polysubstance dependence in remission, major depression
  - axis III: stomach problems; restless leg syndrome
  - axis IV: psychosocial stressors, moderate, limited access to healthcare systems
- prognosis: poor

- capability: should Claimant be granted benefits, it would be prudent to assign a payee given Claimant's inability to sustain sobriety

**Physical Residual Functional Capacity Assessment Thomas Lauderman, DO, 7/31/06 (Tr. 367-74)**
- primary diagnosis: left knee arthralgia
- exertional limitations:
  - occasional lift: 50 pounds
  - frequently lift: 25 pounds
  - stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
  - sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
  - push and/or pull: unlimited
- postural limitations: none
- manipulative limitations: none
- visual limitations: none
- communicative limitations: none
- environmental limitations: none

**Psychiatric Review Technique, Joseph Shaver, Ph.D., 8/10/06 (Tr. 375-88)**
- medical disposition: RFC assessment necessary
- categories upon which medical disposition is based:
  - 12.04 affective disorders - disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: MDD, recurrent, moderate
- 12.09 behavioral changes or physical changes associated with regular use of substances that affect the central nervous system: 12.04 affective disorders
- functional limitation:
  - restriction of activities of daily living: moderate
  - difficulties in maintaining social functioning: moderate
  - difficulties in maintaining concentration, persistence, or pace: moderate
  - episodes of decompensation, each of extended duration: one or two

**Mental Residual Functional Capacity Assessment, Joseph Shaver, Ph.D., 8/10/06 (Tr. 389-92)**
- understanding and memory:
  - ability to remember locations and work-like procedures and understand and remember very short/simple instructions: not significantly limited
  - ability to understand and remember detailed instructions: moderately limited
- sustained concentration and persistence:
  - ability to carry out very short and simple instructions: not significantly limited
  - ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited

- ability to sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions: not significantly limited
    - ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
- social interaction
    - ability to interact appropriately with general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes: not significantly limited
    - ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness: moderately limited
- adaption:
    - ability to respond appropriately to changes in work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others: not significantly limited
- assessment: claimant retains mental capacity to operate in routine, low stress, work situations that require 2-3 step operations

**Psychiatric Review Technique, Jim Capage, Ph.D., 11/13/06 (Tr. 554-57)**
- medical disposition: impairment(s) not severe
- categories upon which the medical disposition is based: 12.04 affective disorders
    - MDD, recurrent
- functional limitation:
    - restriction of daily activities: mild
    - difficulties in maintaining social functioning: mild
    - difficulties in maintaining concentration, persistence, or pace: mild
    - episodes of decompensation, each of extended duration: none
- notes: PRFT#2 was completed as the claimant would be expected to function were he not alcohol dependent.

**Vocational Analysis, Jill Lilly, 12/1/06 (Tr. 190)**
- physical assessment:
    - exertional level: light
    - restrictions: none
- mental assessment:
    - limitations: non-severe
- remarks: without DAA, claimant is mentally non-severe

**Physical Residual Functional Capacity Assessment, Porfirio Pascasio, MD, 12/1/06 (Tr. 568-75)**
- exertional limitations:

- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull: unlimited
- postural limitations: none
- manipulative limitations: none
- visual limitations: none
- communicative limitations: none
- environmental limitations: none
- symptoms: CMT is partially credible

**Mental Impairment Questionnaire (RFC & Listings), Richard Rielly, Ed.D, 1/14/08 (Tr. 592-96)**
- multiaxial evaluation:
  - axis I: acute stress disorder; motor depression with psychosis
  - axis IV: death of fiancé; home fire; lack of support group
  - axis V: current GAF 35
- prognosis: guarded - likely in need of intensive treatment for some time
- mental abilities and aptitude needed to do unskilled work: ability to function is seriously limited
- mental abilities and aptitude needed to do semiskilled and skilled work: no useful ability to function in this area
- mental abilities and aptitudes needed to do particular types of jobs: no useful ability to function in public/social settings and seriously limited ability using public transportation and adhering to basic standards of neatness and cleanliness

**Mental Impairment Questionnaire (RFC & Listings) 2/13/08 (Tr. 632-36)**
- multiaxial evalution:
  - axis I: major depression with psychosis; acute stress disorder; polysubstance dependence
  - axis IV: primary support
  - axis V: current GAF: 35
- mental abilities and aptitude needed to do unskilled work: seriously limited ability to function - no useful ability to function
- mental abilities and aptitudes needed to do semiskilled and skilled work: no useful ability to carry out detailed instructions or deal with stress; seriously limited ability to understand and remember detailed instructions and set realistic goals or make plans independently of others
- mental abilities and aptitudes needed to do particular types of jobs: seriously limited ability to function and no useful ability to travel in unfamiliar place
- functional limitations:
  - moderate limit on daily activities; marked difficulties in maintaining social

functioning
- constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner and episodes of deterioration or decompensation in work or work-like settings

D.    <u>Testimonial Evidence</u>

Testimony was taken at the hearing held on March 21, 2007.  The following portions of the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q    Okay, and for the record you live at 554 Apple [phonetic] Street in New Martinsville?
A    I'm living at group, I'm in Ash Grove [phonetic] - -
Q    Okay.
A    - - in Moundsville [phonetic] right now.
Q    Okay, and how long have you been at the group home?
A    About two weeks now.
Q    And were you at this, this Apple Street at 554 Apple Street address?
A    Prior to that, yes, sir.
                    *              *              *
Q    Okay, your date of birth is August 12, 1962.
A    Yes, sir.
Q    How old are you?
A    Forty-five.
                    *              *              *
Q    So, you write with your right hand or your left?
A    Right hand, sir.
                    *              *              *
Q    The residents, the house that you lived in on Apple Street, was it, did you have more than one floor?
A    Yes, it was two floor.
Q    Two floors.  You had a main floor and an upstairs?
A    Yes, sir.
                    *              *              *
Q    And did you have to take any steps to get into the house?
A    No.
Q    How - -
A    I walked down a hill.
                    *              *              *
Q    Do you have a valid motor vehicle license?
A    No.

18

| | |
|---|---|
| Q | When is the last time that you had a valid motor vehicle license? |
| A | December of last year. |
| Q | And why did you stop having one in December of last year? |
| A | I had a DUI. |
| Q | And when did you have your DUI? |
| A | December. |
| Q | Was that in December of - - |
| A | Yes. |
| Q | Okay, so did you have, had you had DUIs before that? |
| A | Excuse me for a minute, I'm sorry. |
| Q | That's okay. |
| A | Yes, I have. |
| Q | Okay, and do you know have you had any other DUIs let's say since August of '05 - |
| A | No. |
| Q | - - besides the one in December? |
| A | No, it was 10 years prior to that. |
| Q | Okay, now I guess before you lost your license you had, how frequently would you drive? |
| A | How frequently? |
| Q | Yeah, would you drive everyday or a couple times a week or - - |
| A | No, a couple times a week. |
| Q | And typically where would you be going? |
| A | Just to the store and back. |
| Q | How far of a trip would that be? |
| A | A half mile. |
| Q | Okay, where were you going when you got your DUI? |
| A | I was going to a family, her family's house. |
| Q | Your girlfriend's family's house? |
| A | Right, for Christmas Eve. |
| Q | Okay, this was December of - - |
| A | 06-08. |
| Q | - - '06. Okay, it's a difference, right? Okay, so your DUI wasn't in '07, it was in '06? |
| A | Right. |

*       *       *

| | |
|---|---|
| Q | So, when did you actually lose your license? |
| A | December, right around that time - - |
| Q | All right. |
| A | - - thereabouts. |
| Q | All right, so how did you get around after that? |
| A | Walked. |
| Q | Did you ever take a bus or public transportation? |
| A | Northwood provides transportation every now and then. |

Q      Okay, but you were able to walk where you needed to go if you couldn't get transportation with Northwood?

A      Within a certain distance, yes. I have trouble walking sometimes.

Q      Okay, and that's because of your knee?

A      Yes, sir.

Q      What did you do to your knee?

A      I got in a car accident.

Q      And what type of injury did you have to your knee?

A      I don't know what it was. They did an operation on it.

Q      Okay, and when did you have your car accident where you injured your knee.

A      It's been about five, six years ago or better.

                               \*              \*              \*

Q      Tell me about your education training. Did you graduate from high school?

A      I got GED.

Q      And when did you do that approximately?

A      '81.

Q      Ever have any additional education training after you got your GED?

A      I have a couple years of college.

Q      Where did you go to college?

A      Marshall.

Q      And what were you studying?

A      Counseling.

Q      And did you finish two years of school and then leave or what?

A      No, I had to leave right in the middle of the second year actually.

Q      Okay, so you had about one and a half years of school?

A      Yes, sir, sorry.

Q      Any other educational training?

A      No, sir.

Q      Excuse me. Tell me about your work history. I'd like to briefly go through your work history. When did you last work?

A      I have to ask somebody to look that one up. I'm not for sure exactly the date on that.

Q      Okay.

A      It's been over two years I think.

Q      Do you recall what it was you were doing?

A      I was cooking chicken, Kentucky Fried Chicken.

Q      Okay, and where did you do that if you recall?

A      In Martinsville.

Q      And how long did you work there?

A      About three months if that.

Q      And why did you stop working there?

A      I was having trouble concentrating and doing the jobs that I had to do.

Q      And do you remember the name of the company you were working for?

A      No, I don't. It was Kentucky Fried Chicken. It was a franchise.

Q        Okay, so it was a Kentucky Fried Chicken.   Now, there was, there you have some wages from Morgan's [phonetic] Restaurant of West Virginia, Inc., Cleveland, Ohio, and that's in 2005.  Do you know what you did there?

A        I think it was a Pizza Hut.

Q        Okay, and were you making pizzas or what were you doing?

A        Yes, that's - -

Q        Okay, and then you worked for, you had wages for TBC Corporation, Juno, their address is Juno Beach, Florida, and that was about $8,500.00.  Just because the address is in Florida doesn't necessarily mean that's where you were working but - -

A        That was probably the tire company that I worked for.

Q        Okay, what did you do for the tire company?

A        I was just a laborer.

Q        Okay, did you ever live in Florida?

A        No.

Q        Okay, then there's also, no, that's your only wages it shows for '05.  I don't see anything for two years ago which would be, well it could be '05 but, and I don't see anything that says KFC.  So, I don't know whether you worked - -

ATTY        TBC, Taco Bell Corporation, KFC Taco Bell.

AJL        Okay, well that's the Juno Beach one then.

ATTY        Yeah, the tire place is NTB.

ALJ        Yeah, well.

ATTY        It's in there.

BY ADMINISTRATIVE LAW JUDGE:

Q        - - it looks like you worked for more than a couple months.  It looks like you had about $8,500.00.  So, how much do you make an hour when you were working there if you recall?

A        Taco Bell or - -

Q        Yeah.

A        - - Kentucky Fried Chicken?

Q        Yeah.

A        It was minimum wage I believe.

Q        Okay.

A        I'm not sure exactly which one that was, $8,500.00.

Q        Now, you also have some wages in '04 from Midland [phonetic] Food Services and they had an address Savron [phonetic] Ronald Member.  This is in Independence, Ohio.  Do you recall what that was - -

A        No, sir.

Q        - - in '04?  Okay.

A        I have trouble remembering.

Q        Then in '03 you had an earnings, apparently you were working at, were you managing a Pizza Hut?  Did you - -

A        Yes.

Q        Okay, how long did you, looks like you did that in '03 and '02?

A        I was just a manager there for probably three months.  I was doing labor, assistant

manager things prior to that.

Q     Prior to that.  As an assistance manager what did you do?

A     Anything that needed me to pretty much.

Q     Okay you could be making pizzas or you could be stocking shelves or - -

A     Yes, sir.

Q     - - you could be, as a manager did you, when you worked as a manager did they have more than one manager per store or - -

A     No.

Q     Okay, so you were responsible for everything basically that went on in the stores when you were the manager of the store?

A     Yes, sir.  Delegated most of it out.

Q     But that would include hiring and firing people?

A     Yes, sir.

Q     Scheduling?

A     Yes, sir.

Q     Ordering supplies?

A     Yes, sir.

Q     Making bank deposits and doing the reports that corporate would need to have done.

A     Yes, sir.

Q     Why did you stop doing working as the manager?

A     I had a breakdown.

Q     Okay, mental, physical, or what do you mean?

A     Mentally.  I just couldn't take it.

Q     Now, were you using drugs or alcohol?

A     No, sir.

Q     So, what happened, I mean, did you end up in a mental hospital?

A     No, I ended up moving up here.

Q     Where was the Pizza Hut located?

A     Texas.

Q     In Texas, okay.  Whereabouts in Texas?

A     Dallas.

Q     So, so why did you move up here?

A     I had to get away from everything.

Q     And why did you have to, I mean, did you have any, I guess I'm not quite clear, did you have any, did you seek any medical treatment at the time or did you just come up to West Virginia or Ohio?

A     I just came up to West Virginia at first.  After that I had got medical attention.

Q     Now, in, I guess you worked for Pizza Hut for several years.  That was all in Texas?

A     There was one place in New Martinsville when I first moved here.

Q     Okay, so that would have been after you came from Texas?

A     Right.

Q     There's some wages from SNE Enterprises.  They have an address of Wisconsin

but it looks like '99 and 2000.

A     Yes, sir.

Q     What did you do?  Was that a restaurant or what was that?

A     No, that was a window manufacturer.

Q     What did you do there?

A     I was a line lead.

Q     Okay, so basically as a line lead you would make sure that the materials that the people need to process the window in that particular line was there and did you, did you supervise the - -

A     Supervision of the line basically.

Q     And how many people worked on the line?

A     Anywhere between 15 and 25.

Q     Okay, they had, you had like material handlers that would supply the lines with the stuff that was needed?

A     Yes, sir.

Q     Is that you supervised those people or was that - -

A     Yes.

Q     - - somebody else's job?

A     That was somebody else's job.

Q     But if you - -

A     I would tell them what we needed and they would go get it.

Q     Okay, why did you stop doing that work?

A     I moved to Texas.

Q     Why did you move to Texas?

A     I had family in Texas.

Q     Now, you, I guess you did, you worked in Pizza Hut.  It says Mountaineer Pizza Hut Inc.  Was that in Morgantown or where was that?

A     That was in Huntington.

Q     Huntington, okay.  Was that just as a cook or a - -

A     I started out as a cook and I was assistant manager at the final end of it.

Q     Okay, so as you sit here today tell me why you're not able to work.  Tell me what you feel is the most serious problem and how that affects your ability to work.

A     Well, I've got depression, anxiety disorder.

Q     And how long have you had that?

A     As long as I can remember I've had a lot of depression.

Q     Now, you've also had some use of alcohol and other illegal substances.

A     Yes, sir.

Q     So, tell me when is the last time that you drank alcohol?

A     I had an attempted suicide about a month and a half ago.

Q     So, was that, where were you?  I mean, you were trying to, I mean, you say you attempted suicide.  Does that mean you were drinking or what?

A     Yeah, I drank, I was going to drink myself - -

Q     So, were you drinking at home or - -

A     Yes.

Q      - - where were you drinking?

A      At home.

Q      So, what happened?  Someone - -

A      What do you mean?

Q      Well, did someone find you and take you to the hospital or - -

A      No, I walked down.

Q      Walked down to the hospital?

A      Yeah.

Q      So, did they, I mean, were you in treatment with Northwoods at that time?

A      Yes.

Q      Had you been, had you been through a program to help you stop drinking at Northwoods?

A      No, they were treating me for depression and anxiety.

Q      So, where did you go for treatment then?  Did you go someplace for alcohol treatment after you tried to drink yourself to death?

A      No.

Q      What did they do for you at Northwoods?

A      Just quit.  What'd they do for me?  They got me back on my medication for my depression and anxiety.

Q      How long had you been off of those?

A      It's about a week and a half I think I had taken off taking my medication.

Q      Okay, now is that, and so when is the last time that you used illegal substances, you know, like marijuana or cocaine or anything like that?

A      It's been a long time.  I'm not sure the exact date on that.

Q      So, what type of treatment are you involved with at Northwoods?  You have a case manager here with you today.  How long have you had a case manager?

A      Since I started at Northwood.  I'm not really sure of the exact dates.

Q      Well, were you already in treatment?  I guess you were already in treatment at Northwoods when you had the problem with the, with the drinking a month and a half ago?

A      Yeah, I drank at one time, right.

Q      How about smoking marijuana, when is the last time you did that?

A      I'm not sure of the exact date on that.  It was a while past before that, a long while.

Q      So, what type of treatment then do you get at Northwood?  I mean, you go for group meetings or you see a therapist or what's the program?

A      They've got me in a day treatment program where I discuss my illnesses.

Q      So, how long have you been in the day treatment program?

A      I'm going to give a roundabout figure, about nine months.

Q      And basically then you go everyday?

A      Try to, yes, sir.

Q      And do you get there?

A      By bus.

Q      So, the Northwood picks you up or - -

A      Yes, sir.

Q        And then how long are you there during the day for the - -

A        Until 2:00, it's 8:00 in the morning until 2:00 in the afternoon.

Q        And what then are the programs that you have?

A        Specific ones?  Depression, anxiety, coping skills.

Q        And these are, I mean are they like group meetings that you go to or - -

A        Well, we read papers and we answer questions about the papers.

Q        Okay.

A        I can't, if I can remember.

Q        And do you have any, do you have, you do that, do you have any one-on-one counseling?

A        I take that with individual therapy, yes, Barb Theodora upstairs.

Q        And so is that part of the day program?  I mean, you're there - -

A        No, it's, it's while I'm there I schedule the meetings with our - -

Q        With your therapist?

A        With my therapist, right.

Q        So, do you have any, you know, group meetings?  You talked about having some materials that you work out of but do you have any other - -

A        There are about five people that go to that - -

Q        Okay, and - -

A        - - that meeting everyday.

Q        So, how do you know when you've completed the program?  Is it a certain number of days that you go or is it certain things they want you to achieve?

A        Yes.

Q        Okay, do you know what the goals are or what things - -

A        They have a treatment plan that I've signed and I have to achieve certain skill level on - -

Q        What's, I mean - -

A        - - certain things.

Q        All right, like I mean it says okay you have to go for 90 days without using drugs or alcohol or is there - -

A        No, it's more on the lines of outbursts or being able to concentrate and function with people.

Q        Now, are you taking any medications?

A        Yes.

Q        And you're, it says here you're taking Effexor and that's from Monica Smith [phonetic]?

A        Yes, sir.

Q        And that's somebody you see at Northwoods?

A        Yes, sir.

Q        And about how long have you been taking that medication if you recall?

A        They've had me on anti-depressants for a long time but that's a new one they put me on because the ones that they had weren't working.

Q        All right, can you, I mean, is it like the last week or the last - -

A        No, it's been - -

Q      - - month?

A      - - about six months I've been on that one.

Q      Okay, how about Trazodone?

A      I've been on that one for quite some time, probably a year and a half.

Q      And that's to try to, you take that at night?

A      Yeah.

Q      And that's supposed to help you sleep?

A      Supposed to, yes.  It calms me down.

Q      Okay, how about the, the Effexor, when do you take that?

A      In the morning.

Q      The Vistaril, it says again it says 50 milligrams and it says that's prescribed for anxiety.

A      Yes, sir.

Q      And how long have you been taking that?

A      Ever since I've been there, probably a year and a half, two years.

Q      So, you've been getting some type of treatment from Northwoods for the last year and a half to two years?

A      If not longer than that, sure.

Q      Well - -

A      I don't know the exact date on that.

Q      Okay.

A      I can't remember.

Q      How about the, there's also a reference to Risperdal - -

A      Yes, sir.

Q      - - being prescribed in 2002.

A      Yes, sir.

Q      Do you know why they started you on that in 2007?

A      I was having paranoia, a lot of controlled anxiety panic attacks.

Q      And how would that, I mean when did you have your panic attacks?

A      They were, they were frequent.  I think the last one I had was right before I went into the unit again.

Q      Were you ever, you're in a day program now but were you ever basically confined or hospitalized at Northwoods where you stayed there 24 hours a day?

A      Yes.

Q      When did you do that?

A      The last time I was on the unit it was prior to going into the group home, about two and a half, three weeks ago.

Q      Okay, did you have any other problem that you wound up on the unit, I mean, with drugs or alcohol?

A      I was having panic attacks.  It wasn't drugs or alcohol.

Q      So, so what was the, how did your panic attacks manifest themselves?  What happened?

A      What happens I have chest pains, shortness of breath.

Q      Okay, how did you get to Northwoods?

A     I damn near crawled.

Q     Okay, so does that mean that you walked to Northwoods?

A     Yes.

Q     And what did you tell them when you got there?

A     I told them I was under serious panic attacks and I, you know, had to take down off of it.

Q     Okay, and when they said had to take you down off of it what do you mean?

A     Sat me down in a room and they administered some anti-anxiety medications.

Q     You hadn't taken any illegal drugs or - -

A     No, sir.

Q     Do you have, besides your knee problem do you have any other physical problems that you feel keep you from working?

A     Yeah, I've got chronic bronchitis.

Q     Do you smoke?

A     Yes.

Q     How much do you smoke?

A     I smoke a pipe usually.

Q     And how long have you been smoking?

A     Maybe about a pack a day if I have cigarettes.

Q     Now, you mentioned the last time that you drank was you said a suicide attempt that was a month and a half ago.

A     About that - -

Q     - - and you can't remember when you last used the illegal drugs?

A     I maybe smoked a joint back then.

Q     Back then being when?

A     Back about a month and a half ago, that was it.

Q     Same time when you were drinking?

A     Right.  I was just trying to get it over with.

Q     Tell me about your, your daily activities.  Now, you've been in a program, I guess the day program since you had this incident a month and a half ago?

A     Yes.

Q     And that means you go to Northwoods everyday or five days a week I guess?

A     Yes.

Q     And you're there most of the day?

A     Yes.

Q     And then when you come home what do you do?  I guess right now you're in a group home, so you go back to the group home but do you have things - -

A     Right.

Q     - - things you have to do at the group home like - -

A     Chores.

Q     - - chores?  Yeah, okay.

A     Yes.

Q     So, before you go in the group home and before you had this relapse where you're back at Northwoods, you know, before that let's say earlier in 2007 what did you do?  Give me a

typical day; what time you got up, what you did in the morning, what you did in the afternoon, what you did in the evening.

A    Well, I'd get up in the morning go to Northwood.  Been going there for a long time.

Q    Have you been a day program at Northwood?

A    Day treatment, right.

Q    Okay, about how long have you been in the day treatment there?

A    It's been about nine months.

Q    Okay, the impression that I had was that you had had a problem a month and a half ago and then you went back to Northwoods and they put you in the day program.

A    I've been going to the day program for a long time but I had a problem and I went into treatment, went into the crisis center.

Q    Okay.

A    Then I'm back into the day treatment.

Q    So, when did you go into the crisis unit, and I assume when you say you're in the crisis unit you mean you're confined there or you stay there 24 hours a day?

A    Yes, sir.

Q    When did you go into the crisis unit?

A    Well, the first time was back in December.

Q    Of 2007?

A    Yes.

Q    And how long were you there in 2007?

A    About three weeks.

                    *                    *                    *

A    Then I was out for about a week and a half and wasn't getting any better.  That's when I had the panic attacks and went back in.

                    *                    *                    *

Q    When you were living with your girlfriend and you weren't going to Northwoods what were you doing?  How did you spend your time?

                    *                    *                    *

A    When I stopped working I tried to go into Northwood and tried to get help.

                    *                    *                    *

Q    So, you're saying you've been in treatment with Northwood three years or two and a half years, whatever it is?

A    Pretty much that.

Q    Okay, but - -

A    Yes, sir.

ATTY          Exhibit 2F starts with August 11, 2005.

BY ADMINISTRATIVE LAW JUDGE:

Q    Okay, but has he been in a, has he been in a, I mean have you been in the program where everyday you go to Northwoods and you've been doing that since August of 2005?

A    Yes, sir, pretty much.

Q    Okay, and then your caseworker is shaking her head no.

A    I don't know.

WTN           After Patty [phonetic] died was when he went in April.  It would have been like the next month you started with your treatment.

CLMT          Okay.

ALJ             So, that would be April of - -

WTN           Ten.

ALJ             - - '07?

CLMT          Prior to that.

ALJ             Yeah.

ATTY          I guess what he's saying is what did you do when she was alive when you were living at the house?

CLMT          We tried to go out and like be out on the farm and walk around, do a little, you know, hunting.  We didn't do a whole lot, just - -

BY ADMINISTRATIVE LAW JUDGE:

Q             Did you live on a farm?

A             No, we just - -

Q             Whose farm did you - -

A             It was a family farm.

Q             Your family or her family?

A             Hers.

Q             So, what type, what were you deer hunting or what were you doing?

A             No, we were root hunting mostly.

Q             You mean for - -

A             Ginseng.

Q             - - Ginseng?

A             Yes, sir.

Q             So, did you, I mean if you're able to find that that's fairly, they pay you a pretty good dollar for it don't they or - -

A             Well, it's hard to find.

Q             I guess that's why they pay you a good, a pretty good dollar for it.

A             If you can find it.  I wasn't that good at it, she was.

Q             So, there were people that would buy it then once you, I mean, is there dealers that you went to?

A             We rarely found any.

Q             So - -

A             Had to walk for miles because we didn't find any.

Q             So, anything else you want to tell me about your condition or why you're not able to work?

A             Well, I really have a hard time concentrating a whole lot.  Sitting here reading, I can't read very well, shake.

Q             Do you attribute that to your medication?

A             No, I attribute that to my mental illness.

Q             How about your, your alcohol use?  Does that have anything to do with it?

A             With what, sir?  I don't understand.

Q             Your concentration.

A       I don't use alcohol that much now.

Q       At one point you did on a regular basis?

A       A long time I used it a lot.

Q       Okay.

A       A long time ago, probably back in the 80s.

Q       Now that's the last time you used alcohol on a regular basis, the 80s?

A       On a regular basis, yes, sir.

Q       How about your drugs and the other cocaine or - -

A       I just don't, I never, I don't use that much. I don't drink that much.

Q       Well, you - -

A       I'm not really following you.

Q       - - probably shouldn't be drinking at all, right?

A       Right, that's, I don't drink.

Q       Okay. So, which of the jobs that you worked at in the past did you like the best?

A       That I liked the best?

Q       Yeah.

A       Probably the window manufacturer.

Q       Doing the supervising the people on the line?

A       Yes, sir.

Q       Why did you stop doing that? You said you moved or - -

A       Yes, I moved.

Q       Did you ever look for anything like that once you came back?

A       No, I started getting ill.

Q       So, have you taken your medicine today?

A       Yes, extremely nervous today, I'm sorry.

Q       Okay, well it looks like your right arm or you're shaking. I mean, why do you do that, because you're nervous?

A       [INAUDIBLE] it's my anxiety is real high, sorry.

Q       Okay, you don't have tremors of some type. I mean - -

A       Other than shaking, no, like I'm doing now.

*        *        *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       What kind of things make you nervous that cause you to shake like this?

A       Sometimes it doesn't take much at all, just day-to-day activity.

Q       How are you functioning in your group?

A       I try to stay quiet and listen and participate when I can or I have to.

Q       How often do you get to participate and contribute? Is this something that happens every day?

A       Yes, I try to do something every day. I'm not - -

Q       What did you try to do recently?

A       Today we did a collage, just cut things out of a magazine and pasted them on - -

*        *        *

Q       Is it, doing a collage, that's kind of like what you do almost every day, something like that?

A     Well, there's an activity planned, whether we read or do a collage or watch an educational movie or something like that.

Q     Do you feel like you're getting any better with your treatment through Northwood?

A     I think it's going to take some time.

Q     Well, you've been doing it for a while.  How would you say, you know, your progression has been?  Do you think you've gotten better, stayed the same, or gotten worse since you started back in August of '05?

A     I've gotten worse.

Q     And do you kind of relate that to a specific event?  Like how are you doing?  Like I understand like it seems to me that when your girlfriend died you had a real big problem - -

A     Yes, I did.

Q     - - and you've been under pretty serious treatment since then.  I that - -

A     Yes.

Q     What about before that?  You said you did some root hunting.  How often did you go root hunting?

A     We tried to do it everyday.

Q     Did you, I mean, how much time would you spend doing that?

A     Probably four or five hours a day.

Q     And do you think - -

A     Doing chores.

Q     Do you think that you could have worked back before she died?

A     I doubt it.

Q     Why not?

A     I was just getting bad.  I mean, the depression was starting to kick in really hard then.

Q     When was it starting to kick in?

A     Back whenever I quit the job.

Q     Okay, this was August of '05?

A     Yes.

Q     Okay, so did you root hunt after August of '05?

A     Yeah, that was [INAUDIBLE] we'd go out and be in the woods.

Q     Okay, and do you think you could have done that for a living?

A     No.

Q     Why not?

A     There's no money in it.

Q     Is this more of a hobby?

A     Yeah, it's more a way of getting out and trying to get away from everything to calm me down.

Q     Did it help?

A     Yes.

Q     Now, you told the Judge that your house burned down.  When did it burn down?

A     October.

*          *          *

Q      Okay, and when did you officially move out of there?  Are you officially moved out yet?

A      Yes, I'm living at the home now.

          *                *            *

Q      No, I guess what I'm saying is how long after your house was on fire did you continue to live there, up until two weeks ago or three weeks ago?

A      No, well, I tried to live in there.

Q      Okay, what happened?

A      I dug myself out a hole and I got rat bit and just the conditions are so bad there I just couldn't do it, got too cold.

Q      Did anybody instruct you to leave the house?

A      Everybody was trying to convince me to but I was just having a hard time.

Q      What were you having a hard time with?

A      Just living there.  I was trying to live there but I couldn't do it.

Q      Okay, so people were telling you to get out, so why didn't you listen to them?

A      Stubborn.

Q      And what ultimately lead you to go into the group home two weeks ago?

A      Panic attacks.

          *                *            *

A      They said it was best that I, so I could take care of myself.

Q      Who is they?

A      The people treating me.

Q      The people that see you, the therapist - -

A      The treatment, yeah.

Q      - - at Northwood?

A      The treatment team at the crisis unit.

Q      How many times have you been in the crisis unit say since August of '05?

A      They said 10 times.

Q      Ten different times?

A      Yes.

Q      And how long are you normally there when you're there?

A      Anywhere between 30 days to two weeks, three weeks.

Q      Okay, 30 days is longer than three weeks.  So, two, a couple weeks to up to a whole month?

A      Right.

Q      Okay, as far as, let's see, I just have one question, one question to ask, as far as the, as far as the job at the KFC/TacoBell cooking chicken, cooking chicken job, why could you not do that right now?

A      I can't concentrate.  I shake too much.

Q      Well, concentrating as far as all you did was fry chicken, is that right?

A      Yeah.

Q      Well, how would you concentration affect your ability to do that?

A      Well you'd have to put down what they wanted you to put down and cook it at certain temperatures and try to cook it as long as they say to cook for it on the timers and

everything and I wasn't getting it. I couldn't do that.

Q You couldn't get - -

A So, I was burning - -

Q - - on that as far as the time?

A No, I was not putting down enough because I couldn't hear them very well.

Q Was that all you did pretty much there?

A Yeah, and cleaned.

Q And cleaned as far as what mopping and - -

A Yeah.

Q - - wiping counters?

A Yes, sir.

Q And how did you do in that?

A They say I did it poorly.

Q Did you lose, did you quit or did you get fired?

A I quit.

Q And what caused you to quit ultimately? Was there some specific thing or was it just you didn't go back?

A Well, there were times when I would have accidents and I didn't go back.

Q When you say accidents what do you mean?

A I'd spill oil all over the place or flour would go everywhere and make a big mess and they just couldn't deal with me anymore. I was having a hard time, you know, being there.

Q Did you finish out your shift the last day or did you quit in the middle of your shift?

A I quit in the middle of my shift.

Q Did you tell your boss you were quitting?

A No, I just had to walk off. I couldn't do it anymore.

*               *               *

E.     Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records. The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

• does not have a valid driver's license (Tr. 36)
• has a history of drug and alcohol abuse (Tr. 46, 59)
• is in a day treatment program and individual counseling for mental problems (Tr. 48-49)
• is a smoker (Tr. 53)
• does chores at the group home (Tr. 54)
• cannot read very well (Tr. 59)
• shakes from anxiety (Tr. 60)
• previously root hunted everyday for 4-5 hours/day (Tr. 62-63)
• has lived in the crisis unit ten times since August 2005 (Tr. 65)

- takes care of a pet cat (Tr. 163)
- can no longer focus or concentrate (Tr. 163)
- sleeps a lot (Tr. 163)
- does not bathe often; rarely shaves; wears the same clothes (Tr. 163)
- needs reminders to bathe and take medications (Tr. 164, 181)
- does not prepare his own meals (Tr. 164, 181)
- is able to do household chores (Tr. 164)
- goes outside almost daily (Tr. 165, 182)
- is able to go grocery shopping (Tr. 165, 179, 182)
- is able to count change (Tr. 165, 182)
- is not able to pay bills, handle a savings account, or use a checkbook/money order (Tr. 165, 182)
- watches television; plays on the computer (Tr. 166, 183)
- goes to counseling at Northwood (Tr. 166, 179)
- has problems getting along with people (Tr. 166)
- is not able to pay attention for long periods of time (Tr. 167)
- does not follow written or spoken instructions very well (Tr. 167, 184)
- does not handle stress well (Tr. 168, 185)
- does not adapt well to changes in routine (Tr. 168, 185)
- takes care of a pet dog (Tr. 180)
- has trouble sleeping (Tr. 180)
- no problems with personal hygiene (Tr. 180)
- does not need reminders to take medications (Tr. 181)
- is able to take the trash outside (Tr. 181)
- needs company when going outside (Tr. 182)
- needs reminded to attend appointments (Tr. 183)
- follows spoken instructions pretty well (Tr.. 184)

## III.  The Motions for Summary Judgment

A.     <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant SSI and DIB is not supported by substantial evidence because the ALJ committed reversible error by finding that a substance use disorder is a contributing factor material in the determination of disability.

Commissioner contends that the ALJ did not err because substantial evidence exists in the record to support the ALJ's finding that drug and alcohol abuse is a contributing factor material to the determination that Claimant is disabled.

B.      Discussion

1.      Whether Substantial Evidence Supports a Finding that Drug and Alcohol Abuse is a
        Contributing Factor Material to the Determination that Claimant is Disabled.

Claimant argues that the ALJ's decision is not supported by substantial evidence because

the medical evidence of record clearly shoes that Claimant has been involved in extensive mental

health treatment during the period of disability and Claimant maintained a period of complete

sobriety from September 2006 through December 2007.  Claimant also argues, assumingly in the

alternative, that "only on one occasion (that being in December 2007), did he consume any

alcoholic beverages (four (4) quarts of beer in an attempt to commit suicide per the

documentation of record)," and therefore, drug and/or alcohol abuse "simply cannot be found to

be a 'material' factor to his claim for Disability since it cannot be shown that if the alcohol

addiction was not present, he would NOT still be disabled."[5]

Commissioner contends that the ALJ, in accordance with the regulations, evaluated the

extent to which Claimant's mental and physical limitations would remain if he stopped abusing

drugs and alcohol and appropriately concluded, based on the medical evidence of record, that in

the absence of substance abuse, Claimant would not be disabled.

This Court's review of the ALJ's decision is limited to determining whether the decision

is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence"

is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" is not a "large or

considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might

_____

[5] Pl. Br. P. 9.

accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65

(1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  The decision before the Court

is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is

supported by substantial evidence."  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005)

(citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if

it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

The ALJ must follow a five-step analysis to determine whether a claimant is disabled.  20

C.F.R. § 404.1520(a)(4) (2009).  If a person is found to be disabled and there is medical

evidence of drug addiction or alcoholism, the ALJ "must determine whether your drug addiction

or alcoholism is a contributing factor material to the determination of disability."  20 C.F.R. §

404.1534(a) (2009).  If the Commissioner finds that a claimant is disabled and medical evidence

of drug addiction or alcoholism exists, the Commissioner must follow the governing regulation

to determine the materiality of the addiction to the disability.

> (1) The key factor we will examine in determining whether drug addiction or
> alcoholism is a contributing factor material to the determination of disability is
> whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical
> and mental limitations, upon which we based our current disability determination,
> would remain if you stopped using drugs or alcohol and then determine whether
> any or all of your remaining limitations would be disabling.
>> (i) If we determine that your remaining limitations would not be disabling,
>> we will find that your drug addiction or alcoholism is a contributing factor
>> material to the determination of disability.
>> (ii) If we determine that your remaining limitations are disabling, you are
>> disabled independent of your drug addiction or alcoholism and we will
>> find that your drug addiction or alcoholism is not a contributing factor
>> material to the determination of disability.

20 C.F.R. § 404.1534(b) (2009).

The ALJ found Claimant's substance abuse a material contributing factor in his disability

and therefore found Claimant not entitled to benefits under the listings. (Tr. 15). The ALJ determined that while Claimant had severe mental impairments aside from substance abuse, they were not of such severity as to meet either listing 1.02A or 12.04. (Tr. 15). The ALJ's findings will be upheld as long as substantial evidence exists to support them. Hays, 907 F.2d at 1546.

The ALJ correctly followed the regulations. First, the ALJ found that Claimant had severe impairments including left knee arthralgia; alcohol dependence; cannabis dependence; polysubstance dependence (in remission); and major depression, recurrent, moderate. (Tr. 13). Second, the ALJ found Claimant's impairments met listings 12.04 and 12.09. (Tr. 13-15). Because the ALJ found that the medical evidence of record indicated that Claimant continued to drink alcohol despite treatment, the ALJ then engaged in an analysis to determine the materiality of alcoholism as a contributing factor to Claimant's disability. (Tr. 13 & 15). After conducting this analysis, the ALJ found that if Claimant stopped his substance abuse, Claimant would still have severe impairments of left knee arthralgia and major depressive disorder. (Tr. 15). These impairments, according to the ALJ, neither met nor equaled either listings 1.00 or 12.00. (Tr. 15). Additionally, if Claimant stopped his substance abuse, the ALJ found Claimant would have the residual functional capacity to perform light work. (Tr. 19).

After reviewing the evidence, the Court finds substantial evidence exists to support the ALJ's conclusions. The ALJ engages in a lengthy discussion examining the objective medical evidence before determining that Claimant would not have an impairment that met a listing and could perform light work absent the contribution of alcoholism and substance abuse. (Tr. 15-19). In this discussion, the ALJ notes contradictions in Claimant's medical records regarding his ability to engage in activities of daily living (Tr. 15-16); doctors' reports detailing Claimant's

"polite and appropriate manner," normal eye contact, and ability to associate with other people (Tr. 16-17); Claimant's own report that he visits the library as one of his primary coping strategies (Tr. 17); and the absence of a history of one or more years of inability to function outside a highly supportive living arrangement. (Tr. 17). Additionally, in regard to Claimant's physical complaints, the ALJ noted that Claimant testified to having trouble walking on his injured knee; however, later in his testimony, Claimant stated that he and his girlfriend "used to walk around the family farm 'every day' hunting for ginseng. He added that it was calming for him to be out in the woods." (Tr. 18). The ALJ also notes that in October 2006 Claimant reported enjoying being in the woods; however, in January 2007 Claimant reported "struggling with having to walk everywhere due to his van key being missing," and in August 2007, Claimant sought treatment for his left knee. (Tr. 18). An x-ray was unremarkable and after switching from Celebrex to ibuprofen in September 2007, "progress notes dated January 2008 contained no mention of knee pain." (Tr. 18). After evaluating the evidence, the ALJ came to the following conclusion:

> The claimant is able to run errands, go to the library, attend Day Treatment, chop firewood, hunt, walk in the woods, look for ginseng, make baskets out of grapevines, drive, care for his pets, attend church, do household maintenance, keep a journal and care for all of his personal needs. Surely if the claimant is able to do all of these activities, he could perform some work-related activities on a regular and sustained basis if he stopped the substance use.

(Tr. 19).

Assumingly, Claimant's main, and sole, argument is that "the issue of alcohol being material to a finding of disability cannot be fairly argued when there is just one episode of use

(that amounting to four (4) quarts of beer on one night in an attempt at suicide).[6]  To support this argument, Claimant relies on a SSA memorandum answering questions about DAA.[7]  When asked how to handle a materiality determination when a claimant suffers from both substance abuse and a mental disorder, the SSA responded that the most useful evidence in determining the impact of substance abuse and mental impairment, each individually, is that obtained during a "period when the individual was not using drugs/alcohol."  Claimant argues that "for the period of September 2006 through December 2007, **he maintained a period of complete sobriety**."[8] Therefore, the ALJ should have used that period as the relevant period to determine the materiality of the substance abuse/alcoholism to a disability finding.

Though Claimant is correct in his statement of the entitlement period, as Commissioner submits, Claimant did not maintain a period of complete sobriety during the months of September 2006 through December 2007.

On October 16, 2006, progress notes indicate that Claimant "apologized for attending last session after drinking a beer"  (Tr. 529);

On September 5, 2007, Claimant reported that his "sobriety continues 'now at almost two weeks since last drinking'" (Tr. 673);

On December 22, 2007, Claimant reported drinking since "he got back to the local area" (Tr. 602, 612, 620, 623); and

On January 9, 2008, medical records indicate that Claimant has been drinking alcohol

---

[6] Pl. Br. P. 10.

[7] http://www.ssas.com/daa-q&a.htm

[8] Pl. Br. P. 8-9.

(Tr. 676).

"The burden of proving that the DAA [drug addiction or alcoholism] is not material falls on the claimant." Finley v. Astrue, 2009 WL 2489264, at 2 (E.D.N.C. 2009). Aside from stating that "the issue of alcohol being material to a finding of disability cannot be fairly argued when there is just one episode of use (that amounting to four (4) quarts of beer on one night in an attempt at suicide)," Claimant offers no further evidence to suggest that the ALJ erred in determining that alcoholism is a contributing factor material to Claimant's disability finding.

The ALJ had substantial evidence to support his finding, and therefore, the ALJ did not err.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err in determining that Claimant's substance use disorder is a contributing factor material in the disability determination.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.


Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 13, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE